*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Mason W. GILPIN**
Midshipman, U.S. Navy
Appellant

**No. 201900033**

Decided: 30 December 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary, Military Judges: Commander William H. Weiland, JAGC, USN (arraignment); Commander Arthur C. Gaston, JAGC, USN (motions and trial). Sentence adjudged 31 August 2018 by a general court-martial convened at Region Legal Service Office Naval District Washington consisting of a military judge sitting alone. Sentence approved by the convening authority: confinement for 30 months, and a dismissal.

For Appellant: Carol Thompson, Esq., Eric S. Montalvo, Esq., Captain Nick S. Mote, USMC.

For Appellee: Captain Brian L. Farrell, USMC; Lieutenant Kurt W. Siegal, JAGC, USN.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

STEPHENS, Judge:

A general court-martial convicted Appellant, U.S. Naval Academy Midshipman (MIDN) Mason W. Gilpin, contrary to his pleas, of violating Article 120, Uniform Code of Military Justice (UCMJ).[1] The charge arose when Appellant and another midshipman, KS, had an alcohol-fueled sexual encounter in the early hours of a Sunday morning in her room at Bancroft Hall.[2] MIDN KS did not remember any of the encounter other than being on top of MIDN Gilpin. A couple of weeks later, she alleged he had sexually assaulted her.

After a bench trial, the military judge acquitted MIDN Gilpin of sexually assaulting MIDN KS when she was incapable of consenting due to her intoxication (Specification 1), but found him guilty of sexually assaulting her when she was "asleep" and "otherwise unaware" (Specification 2).

Appellant asserts four assignments of error (AOE): (1) the military judge misapplied *United States v. Sager*[3] by convicting MIDN Gilpin on theories of MIDN KS being asleep and otherwise unaware, (2) the evidence is legally and factually insufficient, (3) the Government lost jurisdiction to try MIDN Gilpin when it separated him from the Naval Academy, and (4) the trial counsel committed prosecutorial misconduct.

We find the jurisdictional AOE to be without merit, but find the evidence to be factually insufficient, rendering the remaining two AOEs moot.

## I. BACKGROUND

### A. Midshipman KS Texts Midshipman Gilpin That He Had Sexually Assaulted Her

On 13 December 2016, MIDN Gilpin was with a friend in his room at Bancroft Hall when MIDN KS texted him. About three weeks before, he had, in his words, "hooked up" with her in her room in Bancroft Hall. People were

---

[1] 10 U.S.C. § 920 (2016).

[2] Bancroft Hall serves as the on-base residence facility for all midshipmen attending the Naval Academy.

[3] 76 M.J. 158, 162 (C.A.A.F. 2017) (analyzing Article 120(d), UCMJ, 10 U.S.C. § 920(d) (2012), and holding that "asleep," "unconscious," and "otherwise unaware" constitute three separate theories of liability and that "otherwise unaware" means "unaware in a manner different from asleep and different from unconsciousness").

talking about it, and it was a serious offense that could get both of them kicked out of the Academy. The day before he received MIDN KS's text, her doctor told her she had chlamydia. The text she sent read:

> Good evening Mason, I'm sending this to you as a courtesy. I wanted to let you know that what happened was wrong. I want to let you know that we are not ok. I'm going to give you the heads up now to let you know that you gave me chlamydia. Therefore, you should get that checked out. Lastly, I want to give you a heads up before this comes as a surprise that I will be filing an unrestricted report. From now on I believe it would be best and I would appreciate if you did not text or communicate with me in person.[4]

But MIDN KS must have gotten chlamydia from someone else, because MIDN Gilpin did not have it. MIDN Gilpin's friend described him as "shocked" and "confused."[5] He texted her back. He told her he did not have chlamydia, that he did not know what he did wrong, and wondered if this was even MIDN KS texting him. She ordered him to stop texting her. His last message to her was:

> [KS] we have to talk about this in person, you can't just do this. What are you blaming me for doing? I don't understand, it was consensual. We joked about doing it again the next morning, you literally said you liked it on top the next day. I did my best to handle it the next day with the plan B.[6]

## B. The Evening of Saturday, 19 November 2016

### 1. Midshipman KS attends a party

MIDN KS was a second-year student at the Naval Academy. One of her midshipman friends had a small twenty-first birthday party at her sponsor's home in Annapolis.[7] A total of six midshipmen were there, and the sponsor-parents took them out to a restaurant. Among the midshipmen, there was moderate drinking that night.

---

[4] Defense Exhibit J at 5.

[5] Record at 1505.

[6] Defense Exhibit J at 8.

[7] Families living around the Naval Academy may "sponsor" midshipmen to allow them a "home away from home" during authorized liberty periods.

MIDN KS arrived at the party between five and six o'clock in the evening. Having recently turned 21, she had a glass of wine and some beer and then another glass of wine with dinner. After coming back to the sponsor's house, she had a few drinks while she was in the hot tub—including one where she had several ounces of rum in a glass and "took it back like a shot."[8] About an hour before midnight, MIDN KS vomited in the bathroom.

During the evening, MIDN KS was upset about the end of a long-distance relationship with a young man in her hometown. She was very emotional during the evening and was texting back and forth with the ex-boyfriend. It was disputed whether she was also communicating with MIDN Gilpin that evening using a multimedia messaging application that allows users to exchange messages, photos, and videos. MIDN KS left the party sometime before midnight because she was required to be back on board the Academy for "Taps"; her privileges were restricted because she had low grades and had failed her physical readiness test. Just five days earlier, one of her roommates wrote in her journal that MIDN KS told her "nothing in her life is going well."[9]

Another midshipman at the party, MIDN Collins, drove MIDN KS home. Because MIDN Collins was a second-year student, she was not allowed to operate a vehicle on Academy grounds, so she planned to park at nearby St. John's College and walk the approximately half-mile to the Academy and Bancroft Hall. MIDN KS realized she left her wallet and military identification card at the party. With no time to turn around, MIDN Collins parked at St. John's and called "Shipmate," an Academy van service run by midshipmen that gives classmates a no-questions-asked safe ride back to the Naval Academy. This would allow MIDN KS to get back to Bancroft Hall on time, as she would not need her military identification to enter the Academy if she was on the Shipmate van.

Two midshipmen, a driver and a navigator, were operating the Shipmate van that night. The van crew had some difficulty locating the pair, but eventually picked them up and dropped them off outside Bancroft Hall. The driver, by the time of trial a Marine Second Lieutenant, testified she recalled MIDN KS being helped by MIDN Collins as they walked towards Bancroft Hall. The driver, who did not know either of the midshipmen, only remembered them as blonde-haired (MIDN Collins) and brown-haired (MIDN KS).

---

[8] Record at 1070.

[9] *Id.* at 1255.

Leading up to the trial, the driver reached out to MIDN Collins, believing she was the one "pressing charges."[10] She offered to help because she was certain she remembered a drunk blonde-haired midshipman being assisted by a brown-haired midshipman. Prior to trial, she learned it was MIDN KS, who has brown hair, who was allegedly too drunk to consent to sex, and not the blonde-haired MIDN Collins. She testified at trial adamantly—to the point of becoming "combative"[11]—that she now remembered the very drunk brown-haired midshipman was being assisted by the blonde midshipman.

The navigator, still a midshipman at trial, recalled that both midshipmen seemed intoxicated, with MIDN KS more so than MIDN Collins. On cross-examination, however, he admitted that while he was sure MIDN KS was drunk, he only assumed, based on her behavior, that MIDN Collins was also intoxicated. This was the navigator's first and only duty night for Shipmate. He recalled documenting the call in the logbook and having to make several calls back and forth to locate the riders for their pickup. Another thing that stood out to him was that MIDN KS was in her "spirit gear" (Naval Academy athletic gear) instead of her required Service Dress Blue uniform, though the Government disputed this. The navigator could not recall whether they walked into Bancroft Hall assisting one another or not, testifying that he would probably only have remembered if one of them was so drunk as to fall out of the van and need help.

### 2. *Midshipman KS returns to her room at Bancroft Hall*

MIDN Collins described MIDN KS as very intoxicated, so much so that she was "stumbling"[12] and she had to support some of MIDN KS's weight as they walked up the stairs, rather than take the elevator, so she could sign in for Taps. After MIDN KS signed her own name in front of the Company Duty Officer without incident, MIDN Collins testified she helped MIDN KS to her room and helped her change out of her clothes. She accompanied her to the hallway bathroom and then walked back with her to her room. She assisted MIDN KS into her bed, which sat almost six feet off the ground. With MIDN KS in her bed, she plugged her cell phone in near her and staged a trashcan on her desk in case she vomited again. She closed the door, but did not lock it, not knowing if her two roommates would be coming to the room that night—

---

[10] *Id.* at 677.

[11] *Id.* at 715.

[12] *Id.* at 634.

neither did. According to MIDN Collins, MIDN KS did not make any phone calls when she was with her and she was not in any condition to do so.

Yet, phone records showed MIDN KS made three calls right after MIDN Collins left. She attempted to call her ex-boyfriend at exactly midnight. Then she called another midshipman at 12:15 a.m. and spoke to him for 20 minutes. He testified that she "[led] most of the conversation" and she was "upset about a boy."[13] He could tell she had been drinking—she told him so and she slurred some of her words—but she was coherent and making sense during the call. Immediately after that, MIDN KS called and spoke with her ex-boyfriend for 12 minutes. She was very upset and crying, and he knew she had been drinking. But she was coherent, and he could understand her and it was apparent through their conversation that she understood him.

At some point, most likely right after the phone calls, it is possible another midshipman, Ian Heinz, visited MIDN KS's room. MIDN Heinz, who was restricted to the Academy that night, received a text from MIDN KS on her way back from the party, asking for help signing in for Taps. When MIDN Heinz later called MIDN KS to help, MIDN Collins answered MIDN KS's phone and told MIDN Heinz she would help MIDN KS. MIDN Heinz testified he went to MIDN KS's room that night "around 12:30, 12:40."[14] He announced his name, knocked on the door, and entered the dark room. She was in her bed with her phone. He stood on a chair to speak to her. He described her as upset about her boyfriend, but coherent, even stopping to check a text or other message application during their conversation. This visit ended with MIDN KS leaning over her bed to give him a hug and he left the room.[15]

For her part, MIDN KS had no memories of the evening from the time she was drinking in the hot tub until the next morning, except for one thing—she remembers a dream-like snapshot where she saw MIDN Gilpin's face as she was on top of him in her bed.

---

[13] *Id.* at 1450.

[14] *Id.* at 1480.

[15] While the Government strongly disputed this visit ever occurred, MIDN Heinz's testimony that MIDN KS was not so intoxicated that she could not legally consent to sexual activity was corroborated by other witnesses. In any event, the military judge acquitted MIDN Gilpin of Specification 1 alleging MIDN KS was incapacitated from alcohol.

### *3. Midshipman Gilpin returns to Bancroft Hall*

Midshipman Gilpin was also a second-year student. He and MIDN KS had been assigned to the same company, and often the same 12-person squad, since the start of "Plebe Summer" that preceded their first academic year. They had socialized outside of school in a group setting amicably on multiple occasions—proven by photographs—although MIDN KS downplayed the extent of their friendship. They were each contacts on the other's multimedia messaging application and had used the application to communicate one-on-one. That evening, MIDN Gilpin went out in Annapolis to have dinner with his roommate and his family and then celebrated the roommate's twenty-first birthday with some other friends at bars. He returned to Bancroft Hall sometime before three o'clock in the morning. He was very intoxicated, so much so that another midshipman at the duty desk accompanied him back to his room.

The next day MIDN Gilpin told another midshipman (who was friends with both MIDN Gilpin and MIDN KS) what he remembered after returning to Bancroft Hall. MIDN Gilpin said he knew MIDN KS had returned to Bancroft because they were messaging one another on a multimedia messaging application.[16] He said their conversation prompted him to go to her room around three o'clock in the morning, knock on her door, and enter. He sat at her desk as the two talked. Then, at some point, he got up into her bed. They started kissing and had sex. MIDN Gilpin said he abruptly returned to his room for a condom but never went back to MIDN KS's room. MIDN Gilpin said he could not remember ejaculating. The friend testified that it "was a spoken understanding [between him and MIDN Gilpin] that it was a drunken hookup."[17]

After MIDN KS made her unrestricted sexual assault report in December 2016, investigators interviewed her. At trial, she testified that she told investigators that when she and MIDN Gilpin spoke in her room the next morning, he said "[t]hat somebody told him [she] was down there, and he was drunk and bored, and he came to tease me, and things just escalated."[18] The Government however, despite presenting the testimony of the friend who recounted MIDN Gilpin's story of what happened, believed MIDN Gilpin was

---

[16] The Government never presented any forensic evidence from either MIDN KS's or MIDN Gilpin's phone to confirm or deny any multimedia messaging communications between the two that night.

[17] Record at 1076.

[18] *Id.* at 747.

not communicating with MIDN KS on a messaging application that evening and only learned she was in her room and drunk from MIDN Heinz.

MIDN Heinz, a defense witness, testified he saw MIDN Gilpin in the wardroom that night around "3:30, 0300, sometime around then," at which point he told MIDN Gilpin to go to his *own* room.[19] During cross-examination, MIDN Heinz denied he told MIDN Gilpin that MIDN KS was drunk in her room and that he should go "tease" her. The Government later rebutted this through the testimony of MIDN KS's friend, the midshipman whose twenty-first birthday party MIDN KS attended that evening. She testified that the next day in a liberty formation, she was talking to MIDN Heinz and MIDN Gilpin. She testified MIDN Heinz told her that he sent MIDN Gilpin to "mess with [MIDN KS] since they were both drinking."[20]

**C. Aftermath**

*1. The next morning*

The next morning, MIDN Gilpin received two text messages from MIDN KS. The first came at 9:47 a.m.—"Mason"—and went unanswered. About two hours later, she wrote, "Wake your ass up I need to talk to you." When he went to her room, the conversation centered on "what happened" the night before. Both midshipmen were concerned MIDN KS could have gotten pregnant, so MIDN Gilpin offered to purchase Plan B emergency contraception for her.

MIDN KS also called a midshipman friend at 11:36 a.m., shortly after sending MIDN Gilpin the second text message. According to her friend, MIDN KS was "crying" and "hysterical" and said she woke up in her bed with her pants off and hickeys on her neck. MIDN KS told her she remembered hearing or seeing MIDN Gilpin, but made no mention of the sole detail she remembered, and which she would later tell NCIS agents—that she remembered being on top of him. This particular friend had previously filed an unrestricted sexual assault report against another midshipman in her company, a fact of which MIDN KS was aware. As a result, the accused mid-

---

[19] *Id.* at 1533.

[20] *Id.* at 1662. The Government was adamant MIDN Heinz lied about both visiting KS's room and his denial that he sent MIDN Gilpin to her room that night. He was separated from the Naval Academy for lying about an alcohol incident. His testimony, whatever its probative value, does not impact our analysis about the plausibility of MIDN KS being asleep when penetrated and then otherwise unaware when she was on top of MIDN Gilpin during intercourse.

shipman was immediately removed from her company and the chain of command did not pursue any allegations of possible fraternization against her. She testified that she eventually discussed that process with MIDN KS.

MIDN Gilpin had to enlist the help of his older brother, also a midshipman, to get the Plan B. When he later met with MIDN KS, he told her he had to explain what happened to his brother to get his help.

### 2. Naval Academy gossip

Over the next several weeks, which included the Thanksgiving holiday, others in the company learned of the incident. Both MIDN KS and MIDN Gilpin told others what happened, but at this point, MIDN KS did not frame the experience as a sexual assault and no one perceived that she was reporting a sexual assault. MIDN KS eventually told her friends she wanted MIDN Gilpin moved out of the company.

One incident, which was hotly contested, was what may have been said when MIDN KS was in the company wardroom studying on 22 November, the Tuesday after the incident. MIDNs Gilpin and Heinz were also there. MIDN Gilpin left for the head. In his absence, MIDN Heinz and MIDN KS spoke about her encounter with MIDN Gilpin. According to MIDN Heinz, MIDN KS told him she "would do it again" and that "she liked being on top."[21] When MIDN KS testified, she agreed they were all in the wardroom together and that MIDN Heinz was "teasing" her about MIDN Gilpin. But she was adamant she never told him she slept with MIDN Gilpin or described any of the sexual positions, saying "Girls don't talk like that."[22] Weeks later, when MIDN KS texted MIDN Gilpin accusing him of sexually assaulting her, he responded to her, in part, "you literally said you liked it on top the next day."[23] MIDN KS never responded to that text.

About a week before she learned she had chlamydia, MIDN KS and MIDN Gilpin's student Company Commander confronted her about something called a "Dear Santa" note. The company was holding a Christmas party. One of the events was a humorous reading of "Dear Santa" notes. These anonymously submitted notes asked Santa, on behalf of other midshipmen, for such things as "a reasonable sized nose" and the like. One note made clear reference to possible fraternization, or even sex in Bancroft Hall,

---

[21] *Id.* at 1503.

[22] *Id.* at 812.

[23] Defense Exhibit J at 8.

between MIDN KS and MIDN Gilpin.[24] The general gist of the anonymous note asked Santa to "get a room" for them.

The student Company Commander—the most senior midshipman in the company—reviewed these notes for appropriateness a couple of days before the party. When he saw this note, he decided to confront MIDN KS and MIDN Gilpin separately. He confronted MIDN KS first near the company wardroom inside Bancroft Hall. When he initially asked her about the note, she responded with a "deer in the headlights" look and asked him to step outside to talk privately.[25] According to the student Company Commander, she was "surprised and upset" and said something to the effect of, "You don't know the half of it," and that she was dealing with the situation.[26] MIDN KS's statements caused him to recall his Sexual Assault Prevention and Response program training, so he changed the trajectory of the conversation and ceased questioning her, lest he potentially force her disclosure and limit her reporting options.[27] He described how he "backed away in terms of [his] demeanor in the conversation and kind of gave her the floor to . . . talk."[28] He told her if she needed help, he was more than willing to assist, and he ended the conversation. The note was never read at the party, and the Company Commander did not pursue any disciplinary matters relating to the note.

About a week later, while discussing MIDN KS's positive test result for chlamydia, her doctor scolded her for not being more careful in having unprotected sex with her partner. This upset her. The next day, she sent MIDN Gilpin the text message accusing him of giving her chlamydia and accusing him of sexually assaulting her. MIDN KS filed an unrestricted report of sexual assault the following day.

---

[24] The note in question was not retained by the Company Commander to be available in evidence.

[25] Record at 1217.

[26] *Id*. at 1217.

[27] *Id*. at 1215.

[28] *Id*.

## II. DISCUSSION

### A. Standard of Review

Article 66, UCMJ, requires the service courts of criminal appeals to conduct a de novo review of the factual sufficiency of all cases it hears.[29] This "awesome, plenary, de novo power"[30] requires us to weigh all the admitted evidence and testimony at trial, make "allowances for not having personally observed the witnesses," and decide whether we are convinced of the Accused's guilt beyond a reasonable doubt.[31] In doing so, we take a "fresh" and "impartial look at the evidence" and apply "neither a presumption of innocence nor a presumption of guilt."[32] This does not mean that a conviction must be "free from conflict,"[33] but it must be proved beyond a reasonable doubt—the highest standard known to the law. If the evidence admitted at trial leaves us with a "fair and reasonable hypothesis except that of guilt," we are required to set aside the conviction.[34]

### B. The Conviction Lacks Factual Sufficiency

After reviewing the record, including the military judge's special findings,[35] we are not persuaded the Government proved its case beyond a reasonable doubt. "Reasonable doubt is not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it."[36] We do not believe the evidence excluded "every fair and rational hypothesis except that of guilt."[37]

The Government's theory and the presentation of nearly all of its evidence and testimony attempted to prove MIDN KS was too drunk to have consented to sex. MIDN KS even testified that she could not possibly have consented to

---

[29] *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

[30] *United States v. Kelly*, 77 M.J. 404, 406 (C.M.A. 1990) (quoting *United States v. Cole*, 31 M.J. 272 (C.M.A. 1990)).

[31] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[32] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[33] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[34] *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 2-5-12. (10 Sept. 2014) [hereinafter Benchbook].

[35] *See United States v. Clark*, 75 M.J. 298 (C.A.A.F. 2016).

[36] Benchbook at 2-5-12.

[37] *Id.*

sex, despite a near-total absence of memory. "Sir, I did not consent because I did not have the opportunity to consent because I was wasted."[38] But MIDN Gilpin was acquitted of this specification.[39]

The evidence for the other Government theory that MIDN KS was asleep, unconscious,[40] and otherwise unaware while being penetrated by MIDN Gilpin was also lacking. Aside from MIDN KS's intoxication, the Government's evidence focused on her lack of memory due to her blackouts and how she was sleeping that night.

MIDN KS testified she did not remember anything at all that evening between being in the hot tub at the home of her friend's sponsor-family and waking up the next morning, except for the "snapshot" of MIDN Gilpin's face as she was on top of him in her bed. The only evidence of what happened in MIDN KS's room is her single memory and MIDN Gilpin's statements to his friends and later to MIDN KS that they had drunk sex in which she willingly participated. We must rely on MIDN KS's single memory and the attendant circumstances of the case for proof of guilt.

MIDN KS denied that being on top of MIDN Gilpin was at all related to her taking an active role in intercourse. She testified, "I meant that in a way of, like, I think trying to, like, sit up. Not in, like, the manner in which that the defense . . ."[41] was apparently insinuating. She agreed she told NCIS "something about being on top," but then explained, "I—I just remember, like, his face. Like, I don't—I really can't, like, describe, like, in detail if I don't remember."[42]

Although MIDN KS had described seeing MIDN Gilpin's face while she was on top of him as a "dream," she clarified that it was a memory. The defense sleep expert testified that memories cannot be formed when a person is asleep.[43] The Government sleep expert testified that "you're either awake or you're not."[44] So, it appears from the evidence that MIDN KS was awake

---

[38] Record at 789.

[39] Specification 1.

[40] The military judge dismissed this portion of the specification for lack of evidence under Military Rule of Evidence 917.

[41] Record at 737.

[42] *Id.* at 737-38.

[43] *Id.* at 1586.

[44] *Id.* at 1200.

enough to form a memory when she was on top of MIDN Gilpin. The Government sleep expert also testified that it would be nearly impossible for someone to sleep through a non-consensual penetration of their vagina by a penis unless they had "a [blood alcohol content] pushing .3, .4."[45] And that would require "illicit drugs . . . [a] sedative, hypnotics, or other medication."[46]

The Government sleep expert described the phenomenon of "sleep inertia," which is a "cognitive impairment upon awakening," which could last a couple of minutes or longer.[47] The Government expert testified that sleep inertia could be a reason MIDN KS had only one memory of her encounter with MIDN Gilpin. He also explained that a person encountering MIDN KS in a state of sleep inertia would not know she was cognitively impaired and would perceive her to be awake. Persons experiencing sleep inertia can perform high-functioning tasks, such as giving detailed medical instructions over the phone and yet have no memory of involved interaction, as the Government sleep expert had himself once done after he awoke to a phone call at night.

The Government also presented expert testimony from a forensic toxicologist. The toxicologist opined that MIDN KS was experiencing a fragmentary blackout during the evening and that people with fragmentary blackouts can do "just about anything"[48] such as fly planes, drive cars, or do surgery without anyone, even themselves, being aware they are in a blackout stage. MIDN KS changed clothes, walked, climbed stairs, used her phone, and had coherent phone conversations with two people, but she had no memory of those actions, and the people with whom she was interacting had no way of knowing she would not remember later.

The Government's own expert evidence indicates MIDN KS was experiencing fragmentary blackouts where she could appear to another person to be functioning normally in performing high-cognitive activities. The expert testimony also indicated MIDN KS would very likely have been awakened by a non-consensual penetration. We are not convinced MIDN Gilpin could have penetrated MIDN KS while she was asleep without waking her. The experts also testified that MIDN KS could only form memories if she was awake and that one can only be either asleep or awake.

---

[45] *Id.* at 1196.

[46] *Id.*

[47] *Id.* at 1158-59.

[48] *Id.* at 1141.

From this evidence, the military judge's special findings laid out a theory. Essentially, MIDN Gilpin entered MIDN KS's room and climbed into her bed where she was unresponsive. He removed the clothes necessary to penetrate her vagina with his penis while she was asleep. She then awoke from the penetration but was in a state of "sleep inertia" and only "awake enough" to be "otherwise unaware" the sexual activity was occurring. We do not consider that theory compelling enough to reach the required standard of proof for guilt beyond a reasonable doubt.

Even considering this theory, we are unable to rule out every "fair and rational hypothesis" other than guilt. MIDN KS could have just as easily been experiencing fragmentary blackout the entire time MIDN Gilpin was in her room. She would have not remembered anything other than her "snapshot" of being on top of him and MIDN Gilpin would have had no reason to know she was "otherwise unaware" the sexual activity was occurring. She also could have experienced "sleep inertia" after she woke up—which could have been at any time, including before MIDN Gilpin entered her room. If so, he could have reasonably perceived her as consenting.

It is also a "fair and rational hypothesis" that two young squad-mates at the Naval Academy, who one Government witness described as "close friends" and "friends,"[49] had been drinking alcohol and made a very poor decision to have sex. During the trial, expert opinion confirmed that alcohol does indeed lower inhibitions.

In addition, it is difficult to consider the physical and practical aspects of the Government's case without finding reasonable doubt. According to the Government, MIDN Gilpin entered MIDN KS's room, saw her asleep in her loft-style bed, and climbed up into it. He then removed whatever clothing she wore below the waist, and some of his clothing, too, and penetrated her vagina with his penis. At some point, he forcibly moved her dead-weight body—possibly without waking her, or doing so where she was in a state of "sleep inertia"—to where she was on top of him while he continued to penetrate her. Then, MIDN KS, now awake but experiencing "sleep inertia," was in an "otherwise unaware" state. In doing this, he also managed to give her several "hickeys." MIDN Gilpin completed these acts without knowing if either of her roommates might return at any time to discover him sexually assaulting her.

Regardless of what circumstantial evidence may exist, whatever the extent of MIDN Gilpin and MIDN KS's friendship was, whatever credibility problems either various Defense or Government witnesses had, or whatever

---

[49] *Id.* at 1077.

expert testimony either side presented concerning sleep behavior, intoxication, or "counter-intuitive victim behavior," we find the simpler explanation of ill-advised, drunken consensual sex a serious possibility that we cannot ignore—and certainly do not consider it a "fanciful doubt" or "ingenious conjecture."

Even beyond the physical and practical aspects of the alleged crime, one simply cannot ignore the Defense theory that MIDN KS had substantial motives to believe she would not have consented to sex. It is entirely possible MIDN KS does not remember what happened, but MIDN Gilpin reasonably believed they had consensual sex. She was not doing well academically or physically at the Naval Academy. She just ended a relationship with a boyfriend, which, according to all witnesses, made her very upset. She drank alcohol to excess that evening. She knew her student chain of command was aware of an incident that could get her separated from the Naval Academy unless it was a sexual assault. And she apparently, wrongly believed MIDN Gilpin gave her chlamydia.

There is simply too much reasonable doubt associated with the evidence in this case. We are not charged with deciding "who to believe," but simply whether the Government proved its case beyond a reasonable doubt. It did not.

## III. CONCLUSION

The finding and sentence are **SET ASIDE**. The charge and specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property of which Midshipman Gilpin has been deprived due to the finding and sentence are ordered restored. Arts. 58b(c), 75(a), UCMJ.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

15